**SEALED**

ORIGINAL

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT NOV 24  AM 10: 46
FOR THE NORTHERN DISTRICT OF TEXAS
**Dallas Division**

DEPUTY CLERK___MS

# 3-21CV2955-K

UNITED STATES OF AMERICA,
*EX REL.* MELINDA HEMPHILL,

                               Plaintiff,

v.

ALLIED STONE, INC., HUA TONG PRIVATE
LIMITED COMPANY, HUA TONG 88
PRIVATE LIMITED COMPANY, ALLIED
SUPPLY PRIVATE LIMITED COMPANY, JIA
"JERRY" LIM

                               Defendants.

Case No. 20-cv-

**FILED IN CAMERA
AND UNDER SEAL**

*Jury Trial Demanded*

## COMPLAINT OF *QUI TAM* PLAINTIFF-RELATOR

Plaintiff-Relator Melinda Hemphill ("Ms. Hemphill" or "Plaintiff-Relator"), through her

attorneys, on behalf of the United States of America (the "United States," the "U.S.," or the

"Government"), for her Complaint against Allied Stone, Inc. ("Allied"), Hua Tong Private Limited

Company ("Hua Tong"), Hua Tong 88 Private Limited Company ("Hua Tong 88"), Allied Supply

Private Limited Company ("Allied Supply"), and Allied Chief Executive Officer ("CEO") Jia

"Jerry" Lim ("Defendant Lim" and, together with Allied, Hua Tong, Hua Tong 88, and Allied

Supply, "Defendants"), alleges, based upon personal knowledge, relevant documents, and

information and belief, as follows:

### INTRODUCTION

This is an action to recover damages and civil penalties on behalf of the United States

arising from Defendants' violation of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the

"FCA"). Defendants, from at least August 2019 to June 2020, knowingly avoided the obligation

to pay duties required under U.S. duty orders on quartz surface products imported from the People's Republic of China ("China"). In some cases, Defendants falsely described imported Chinese quartz surface products as granite—which is not subject to Section 301,[1] antidumping, or countervailing duties. In other cases, Defendants transshipped quartz surface products through countries from which quartz is not subject to these duties. Defendants thus provided U.S. Customs and Border Protection ("CBP" or "Customs") with false information on the relevant entry documents to avoid paying duties. By all indications, Defendants paid *no* duties on *any* quartz surface products it imported from China, and thus defrauded the United States out of millions of dollars in direct violation of the FCA.

**PARTIES**

1.      Plaintiff-Relator Melinda Hemphill is a resident of Euless, Texas.

2.      Ms. Hemphill has worked in the construction industry for more than two decades. After entering the industry in 2000, Ms. Hemphill went on to co-own a residential and commercial development and construction business in Marshall, Texas. In addition to her role as the business's co-owner, Ms. Hemphill served in project and on-site management roles.

3.      In 2010, Ms. Hemphill joined Republic Elite Multifamily Interiors, LLC ("Republic Elite"), an Addison, Texas-based custom multifamily cabinet and countertop company, as its Supply Chain Manager. In this role, Ms. Hemphill's duties included, among other things, developing relationships with suppliers, sourcing materials, overseeing stone projects, verifying stone drawings (or diagrams outlining dimensions and designs of stone projects, such as a bathroom vanity), creating purchase orders, maintaining Republic Elite's stone inventory in various third-party logistics ("3PL") warehouses, and working with customers to resolve any

---

[1]      "Section 301" refers to the same section of the Trade Act of 1974, 19 U.S.C. § 2411.

issues.

4.     Ms. Hemphill continued working for Republic Elite for nearly a decade, serving in various roles in its cabinets, stone, accounting, and sales divisions.

5.     In 2019, Ms. Hemphill was offered a position at Allied Interior Solutions, a division of Allied, as its Director of Processing.  Soon after joining Allied, Ms. Hemphill was promoted to Vice President of Processing, a role in which she served until she left the company in mid-2020.

6.     Defendant Allied is a privately held stone fabrication and installation company headquartered in Dallas, Texas.  The company was founded in 1999 in Durant, Oklahoma, where it is incorporated.  Allied expanded to Dallas in 2010, before opening showrooms in Houston, Austin, and Lubbock, Texas in 2012, 2016, and 2017, respectively.  Allied registered as a Texas foreign entity in 2007.

7.     Allied is a subsidiary of Hua Tong.  Hua Tong is headquartered in Singapore and is in the business of cutting, shaping, and finishing stone.  Online records show that Hua Tong imports "brick, stone, and related material" from China.  Hua Tong's managing director is Lim Earn Sian.  There are only four Hua Tong shareholders: managing director Lim Earn Sian; Lim Oon Hock; Lim Oon Cheng; and Defendant Lim.  Lim Earn Sian, Lim Oon Hock, and Defendant Lim are also listed as Hua Tong directors.

8.     Hua Tong 88, like Hua Tong, is based in Singapore.  Hua Tong 88 specializes in home and garden retail.  The managing director of Hua Tong 88 is Lim Oon Hock, one of Defendant Hua Tong's shareholders and directors, and likely a relative of both Hua Tong managing director Lim Earn Sian and Defendant Lim.

9.     Allied Supply is another Hua Tong subsidiary.  Like Hua Tong and Hua Tong 88, Allied Supply is based in Singapore.  Allied Supply specializes in non-metallic minerals mining

3

of crushed and broken granite and exports of the same. Allied Supply's website[2] provides that "Allied Supply specializes in unrelenting high quality natural stone products from China." Lim Earn Sian—the managing director of Hua Tong and an apparent relative of Hua Tong 88 managing director Lim Oon Hock and Defendant Lim—is also CEO of Allied Supply.

10.     Defendant Jia "Jerry" Lim is Allied's President and CEO, a role in which Defendant Lim has served since 2003. From 1999—when Allied was incorporated—until 2003, Defendant Lim was employed with Hua Tong in Singapore. As stated above, Defendant Lim is one of four Hua Tong shareholders and one of three Hua Tong directors. Defendant Lim is likely related to Hua Tong managing director and Allied Supply managing director Lim Earn Sian, and the two share a Singapore address. Defendant Lim is also likely related to Lim Oon Hock, the managing director of Hua Tong 88.

11.     The Hua Tong-Allied corporate family and managing officers are further detailed in the following chart:



## JURISDICTION AND VENUE

---

2       *See* Allied Supply Pte Ltd, http://www.tobuystone.com/com/alliedstones/ (last visited Oct. 25, 2021).

4

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     Under 31 U.S.C. § 3730, Plaintiff-Relator is not aware of any public disclosures related to these claims.

14.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants have minimum contact with the United States.  Moreover, Defendants can be found and have transacted business and/or reside in the Northern District of Texas.

15.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found and transact business in this district.  At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within the district and/or maintain employees and offices in this district.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The False Claims Act

16.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  31 U.S.C. §§ 3730(b)(1), (d)(1)–(2).

17.     Further, under what is often referred to as the "reverse false claims" provision, the FCA states that a person is liable to the United States if the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids

5

or decreases an obligation to pay or transmit money or property to the Government." *Id.*
§ 3729(a)(l)(G).

18.    The FCA further provides that the terms "knowing" and "knowingly" mean that a
person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or
falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."
*Id.* § 3729(b)(1)(A)(i)–(iii). Further, these terms "require no proof of specific intent to defraud."
*Id.* § 3729(b)(1)(B).

19.    The FCA defines an "obligation" as "an established duty, whether or not fixed,
arising from . . . statute or regulation." *Id.* § 3729(b)(3).

20.    When Congress amended the FCA in 2009, it made clear that Customs duties fall
within the statutory definition of "obligation." S. Rep. No. 111-10, at 14 (2009) ("The term
'obligation' is now defined under new Section 3729(b)(3) and includes . . . unliquidated obligations
such as tariffs on imported goods."); *see also id.* at 14 n.10 ("[T]he Committee believes that
customs duties clearly fall within the new definition of the term 'obligation' absent an express
reference and any such specific language would be unnecessary.").

21.    Under the FCA, a record or statement is "material" if "it ha[s] a natural tendency
to influence, or [is] capable of influencing, the payment or receipt of money or property." 31 U.S.C.
§ 3729(b)(4).

22.    A person who commits—or conspires to commit—a violation of the reverse false
claims subparagraph is liable to the United States Government for statutory damages and such
penalties as are allowed by law. *Id.* §§ 3729(a)(1)(C), (a)(1)(G).

23.    FCA civil penalties may range from $11,665 up to $23,331 for each violation, plus
three times the amount of the damages sustained by the United States. *See* 31 *Id.* § 3729(a)(1);

*see also* Civil Monetary Penalties Inflation Adjustment, 85 Fed. Reg. 37,004, 37,006 (June 19, 2020).

**B.    Customs Duties, Generally**

24.    Merchandise imported into the United States must be "entered," unless specifically excepted. 19 U.S.C. § 1484(a)(1)(A), (i)(3); 19 C.F.R. § 141.4(a); 19 U.S.C. § 1677(23). "Entry" means that an "importer of record"—in person or by an agent—must file appropriate documents, including an entry "summary statement," with a CBP officer to allow CBP to assess Customs duties and fees due on the merchandise's import.  19 U.S.C. § 1484(a)(1)(B); 19 C.F.R. § 141.0a(a).

25.    An entry summary statement is completed using CBP Form 7501. 19 C.F.R. § 142.11(a); *see also* Ex. 1 (CBP Form 7501 (2021)). Form 7501 requires the importer of record to input, among other things: the merchandise's Country of Origin; Exporting Country; Foreign Port of Lading; United States Harmonized Tariff Schedule ("HTS"), antidumping, and countervailing duty numbers; and HTS, antidumping, and countervailing duty rates. *See id.*

26.    Importers must maintain—and provide upon request—documentation that supports statements made on Form 7501, including commercial invoices, packing lists, a Country of Origin Certificate, and a bill of lading. *See* 19 C.F.R. §§ 141.11; 141.19(a); 141.81; 141.86(a); 142.3(a); 142.6(a).

27.    The commercial invoice must include a detailed description of the merchandise. *Id.* § 141.86(a)(3).

28.    Every importer making an entry must submit a declaration under oath, stating that all statements in Form 7501, the commercial invoice, and other documents filed with Form 7501 are "true and correct." 19 U.S.C. § 1485(a)(3).

7

C. **Antidumping and Countervailing Duties on Quartz and Other Surface Area Products Imported from China**

29. Following a petition filed by Cambria Company LLC and countervailing duty and antidumping investigations by the Department of Commerce ("Commerce"), on May 23, 2019, Commerce issued a final determination that certain quartz surface products from China were being, or were likely to be, sold in the United States at less than fair value ("LTFV"). 84 Fed. Reg. 23,767 (May 23, 2019).

30. Commerce determined the total estimated net antidumping subsidy rates to be the following:

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset percent) |
|---|---|---|---|
| Foshan Yixin Stone Co., Ltd. | Foshan Yixin Stone Co., Ltd. | 333.09 | 295.02 |
| Foshan Yixin Stone Co., Ltd. | QingYuan Yue Feng Decoration Material Co., Ltd. | 333.09 | 295.02 |
| Suzhou Colorquartzstone New Material Co., Ltd.; Shanghai Meiyang Stone Co., Ltd.; CQ Int'l, Ltd. | Suzhou Colorquartzstone New Material Co., Ltd. and Shanghai Meiyang Stone Co., Ltd. | 265.81 | 255.27 |
| Non-Individually Examined Exporters Receiving Separate Rates[3] | Producers Supplying the Non-Individually-Examined Exporters Receiving Separate Rates[4] | 297.40 | 259.33 |
| China-Wide Entity[5] | China-Wide Entity | 336.69 | 326.15 |

---

[3] *See* Appendix III, 84 Fed. Reg. 23,767, 23,771–23,775 (May 23, 2019) (list of "Separate Rates Companies").

[4] These producers are also listed in Appendix III.

[5] The "China-wide entity" includes Foshan Hero Stone Co., Ltd.; Foshan Quartz Stone Imp.

| Exporter | Producer | Estimated weighted-average dumping margin (percent) | Cash deposit rate (adjusted for subsidy offset percent) |
|---|---|---|---|
|  |  |  |  |

*Id.* at 23,769.

31.    Also on May 23, 2019, Commerce issued a final affirmative countervailing duty

determination, stating that countervailable subsidies were being provided to producers and

exporters of certain quartz surface products from China. *See* 84 Fed. Reg. 23,760 (May 23, 2019).

32.    Commerce determined the total estimated net countervailable subsidy rates to be

the following:

| Company | Subsidy rate (percent) |
|---|---|
| Foshan Hero Stone Co., Ltd.[6] | 190.99 |
| Fasa Industrial Corporation Limited | 190.99 |
| Foshan Yixin Stone Co., Ltd. | 45.32 |
| Foshan Nanhai Julang Quartz Co. | 190.99 |
| Qinguan Yuefeng Decoration Material Co. | 190.99 |
| All Others | 45.32 |

*Id.* at 23,762.

33.    On July 11, 2019, Commerce issued the antidumping and countervailing duty final

orders (the "Orders") that apply to certain quartz surface products from China. 84 Fed. Reg. 33,053

(July 11, 2019).

34.    As part of the Orders, Commerce directed CBP to assess antidumping duties for

quartz surface products from China that were entered, or withdrawn from warehouse, for

---

& Exp. Co., Ltd.; Guangzhou Hercules Quartz Stone Co., Ltd.; Hero Stone Co., Ltd.; and Vemy
Quartz Surface Co., Ltd. 84 Fed. Reg. 23,767, 23,769 n.17 (May 23, 2019). As a result, Commerce
assigned the China-wide entity the highest petition dumping margin of 336.69 percent. *Id.* at
23,769.

[6]    Commerce determined that several companies were cross owned with Foshan Hero Stone
Co., Ltd., including Mingwei Quartz New Environmental Protection Materials Co., Ltd. and
Foshan Quartz Stone Imp. & Exp. Co., Ltd. 84 Fed. Reg. 23,760, 23,762 n.15 (May 23, 2019).

consumption on or after November 20, 2018. *Id.* at 33,053–54.

35.    Commerce also directed CBP to assess countervailing duties on all relevant entries of quartz surface products from China and unliquidated entries of such products entered, or withdrawn from warehouse, for consumption on or after September 21, 2018. *Id.* at 33,055.

36.    Under these directives, for all quartz products it imported from China, Allied was required to pay antidumping and countervailing duties of 255.27 percent and 45.32 percent, respectively.

37.    The scope of the Orders covers certain quartz surface products:

Quartz surface products consist of slabs and other surfaces created from a mixture of materials that includes predominately silica (*e.g.,* quartz, quartz powder, cristobalite) as well as a resin binder (*e.g.,* an unsaturated polyester). The incorporation of other materials, including, but not limited to, pigments, cement, or other additives does not remove the merchandise from the scope of the orders. However, the scope of the orders only includes products where the silica content is greater than any other single material, by actual weight. Quartz surface products are typically sold as rectangular slabs with a total surface area of approximately 45 to 60 square feet and a nominal thickness of one, two, or three centimeters. However, the scope of the orders includes surface products of all other sizes, thicknesses, and shapes. In addition to slabs, the scope of the orders includes, but is not limited to, other surfaces such as countertops, backsplashes, vanity tops, bar tops, work tops, tabletops, flooring, wall facing, shower surrounds, fire place surrounds, mantels, and tiles. Certain quartz surface products are covered by the orders whether polished or unpolished, cut or uncut, fabricated or not fabricated, cured or uncured, edged or not edged, finished or unfinished, thermoformed or not thermoformed, packaged or unpackaged, and regardless of the type of surface finish.

In addition, quartz surface products are covered by the orders whether or not they are imported attached to, or in conjunction with, non-subject merchandise such as sinks, sink bowls, vanities, cabinets, and furniture. If quartz surface products are imported attached to, or in conjunction with, such non-subject merchandise, only the quartz surface product is covered by the scope.

Subject merchandise includes material matching the above description that has been finished, packaged, or otherwise fabricated in a third country, including by cutting, polishing, curing, edging, thermoforming, attaching to, or packaging with another product, or any other finishing, packaging, or fabrication that would not otherwise remove the merchandise from the scope of the orders if performed in the

10

country of manufacture of the quartz surface products.

The scope of the orders does not cover quarried stone surface products, such as granite, marble, soapstone, or quartzite. Specifically excluded from the scope of the orders are crushed glass surface products. Crushed glass surface products must meet each of the following criteria to qualify for this exclusion: (1) The crushed glass content is greater than any other single material, by Start Printed actual weight; (2) there are pieces of crushed glass visible across the surface of the product; (3) at least some of the individual pieces of crushed glass that are visible across the surface are larger than one centimeter wide as measured at their widest cross-section (glass pieces); and (4) the distance between any single glass piece and the closest separate glass piece does not exceed three inches.

The products subject to the scope are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under the following subheading: 6810.99.0010. Subject merchandise may also enter under subheadings 6810.11.0010, 6810.11.0070, 6810.19.1200, 6810.19.1400, 6810.19.5000, 6810.91.0000, 6810.99.0080, 6815.99.4070, 2506.10.0010, 2506.10.0050, 2506.20.0010, 2506.20.0080, and 7016.90.10. The HTSUS subheadings set forth above are provided for convenience and U.S. Customs purposes only. The written description of the scope of the orders is dispositive.

*Id.* at 33,055–56, Appendix I ("Scope of the Orders").

38.     In other words, the scope mandates that U.S. importers—like Allied—pay substantial duties on Chinese quartz products, no matter what the Chinese manufacturer does to alter the products, and regardless of how a third country finishes, packages, or fabricates the products. Neither Allied nor any Defendants paid those mandatory duties.

**D.     Section 301 Duties**

39.     Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, grants the United States Trade Representative ("USTR") the authority to investigate and enforce rights under trade agreements between the United States and foreign countries and to respond to certain foreign trade practices.

40.     During the Trump Administration, the USTR initiated an investigation and determined that "China's acts, policies, and practices related to technology transfer, intellectual

11

property, and innovation [were] unreasonable or discriminatory, and burden[ed] or restrict[ed] U.S. commerce." *See* Office of the United States Trade Representative, *Section 301 Fact Sheet* (Mar. 22, 2018), https://USTR.gov/about-us/policy-offices/press-office/fact-sheets/2018/march/Section-301-fact-sheet. As part of its response, the USTR determined to impose additional tariffs of 25 percent tariff *ad valorem* on certain products from China. *Id.*; *see also* Actions by the United States Related to the Section 301 Investigation of China's Laws, Policies, Practices, or Actions Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 13,099 (Mar. 27, 2018).

41.    In a series of "Lists," the USTR designated the impacted products by HTS Code. On September 21, 2018, the USTR published notice of the "List 3" trade action, to apply to all listed products that entered the U.S. from China on or after September 24, 2018. *See* Implementing Modification to Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 21,892 (May 15, 2019). List 3 includes the following HTS Codes:

- 2505.10.10 – Natural silica and quartz sands, containing by weight 95% or more of silica and not more than 0.65% of oxide of iron.
- 2505.10.50 – Natural silica and quartz sands, nesoi.
- 2506.10.00 – Quartz (other than natural sands).

Request for Comments Concerning Proposed Modification of Action Pursuant to Section 301: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 84 Fed. Reg. 46,212 (Sept. 3, 2019).

42.    In other words, in addition to antidumping and countervailing duties, importers of Chinese quartz products—liked Allied—were subject to an *additional* 10-to-25 percent tariff

under Section 301.[7] Allied and the other Defendants also failed to pay these duties.

## DEFENDANTS' SPECIFIC MISCONDUCT

43.    The combination of antidumping, countervailing duty, and Section 301 tariffs were debilitating to importers of Chinese quartz surface products. Indeed, the point of the tariffs was, effectively, to shut down quartz imports from China. And in fact, many stone companies were forced to discontinue importing Chinese quartz.

44.    Allied, however, flourished in this environment by devising schemes to continue its Chinese quartz imports while evading these duties. Ultimately, this allowed Allied to crush quartz competition in the region by offering quartz products at prices substantially lower than competitors' products. Indeed, according to one of Ms. Hemphill's contacts at Republic Elite, as of November 2021, Republic Elite continues to lose customers to Allied, and Republic Elite's management has indicated that Allied is winning bids by selling customers quartz at or lower than the price for which Republic Elite can purchase it.

45.    More specifically, Defendants conspired with their Chinese manufacturers and exporters to make false representations in Customs entry documents about the nature of imported quartz and the true point of origin of transshipped quartz to fraudulently avoid paying antidumping, countervailing, and Section 301 duties to the United States.

---

[7]    Though products subject to Section 301 duties were originally subject to a ten-percent duty in addition to any applicable antidumping and countervailing duties, Section 301 was later modified to apply a 25 percent duty to these products that entered the United States before June 15, 2019. *See* 84 Fed. Reg. 26,930 (June 10, 2019).

**A.    Defendants' Scheme to Misrepresent the True Nature of Imported Chinese Quartz Products**

46.    As stated above, one of Allied's schemes to avoid paying the applicable duties was to misrepresent the true nature of Chinese quartz products as granite or some other stone not subject to those duties.    Ms. Hemphill first observed Allied's fraud during her participation on a multifamily housing project called Olympus on Broadway.

47.    Olympus on Broadway is an apartment complex in Carrollton, Texas, located at 1415 South Broadway Street.[8]  As of July 2021, the complex advertises itself as "brand new." Pre-leasing began in September 2020.[9]  Andres Construction ("Andres") served as the project's general contractor.[10]

48.    On April 1, 2019, Allied submitted a bid to Andres to provide stone products for both apartment units and common areas for the Olympus on Broadway project.    *See* Ex. 2 (Olympus on Broadway Bid).    Allied's bid to Andres included the potential "alternate" of substituting granite in "Scheme 2" apartment units with "Level 1 Quartz," for an additional $115,006.    *Id.*  The bid listed various quartzite and granite products and noted that units were fabricated overseas.[11]  *Id.*

---

[8]    Note that Olympus on Broadway has since been renamed "LYV Broadway." *See* LYV Broadway, https://www.lyvbroadway.com/lyv-broadway-carrollton-tx/ (last visited Nov. 22, 2021); *see also* Multifamily Biz, *Benefit Street Partners Multifamily Trust Acquires 390-Unit Olympus on Broadway Apartments in Downtown Carrollton, Texas* (Sept. 24, 2021), https://www.multifamilybiz.com/news/9849/benefit_street_partners_multifamily_trust_acquires (discussing the rebrand). To avoid confusion, LYV Broadway will be referred to as "Olympus on Broadway" herein.

[9]    *See* Trammell Crow Company, *Fourth Phase of Olympus on Broadway Begins* (Aug. 5, 2019), https://www.trammellcrow.com/en/about/media-center/2019/08/05/olympus-on-broadway-phase-four.

[10]    *See id.*

[11]    Allied ultimately provided even less information on future project bids. *See, e.g.*, Ex. 3 (Mark at DeSoto Bid); Ex. 4 (Mariposa at Westchester Bid).

14

49.     According to an Allied document titled "Final Stone Drawings," Andres ultimately opted to purchase "Blizzard Quartz"—which is subject to antidumping, countervailing, and Section 301 duties—as a substitute for Scheme 2 apartment units. *See* Ex. 5 (Oct. 31, 2019 Revised Allied Final Stone Drawings).

50.     A November 12, 2019 Change Order confirms this substitution, showing that Allied would "[p]rovide Blizzard Quartz in lieu of Silver Grey Granite at Scheme 2 to include 3cm kitchen and 2cm baths. Include updating tariff associated to Scheme 1 granite to current tariff percentages." *See* Ex. 6 (Nov. 12, 2019 Andres Construction Change Order).

51.     Moreover, a February 24, 2020 official Change Order Proposal reflected Allied's upgrades to "Blizzard [quartz]"[12] in the kitchens and vanity areas of units on floors 2 and 4 of the Olympus on Broadway project. *See* Ex. 8 (Feb. 24, 2020 Change Order Proposal).

52.     Plaintiff-Relator Ms. Hemphill was tasked with overseeing all processing aspects of the stone products Allied contracted to provide for the Olympus on Broadway project. Specifically, Ms. Hemphill was tasked with communicating with the on-site project managers and superintendents to ensure the job was on track.

53.     As early as February 2020, mere days after Andres submitted a change order to use quartz products in certain units rather than granite, it became increasingly difficult for Ms. Hemphill to gain necessary insight into stone shipping estimates.

54.     On February 13, 2020, Ms. Hemphill contacted Defendant Lim, Allied's CEO, to inquire about the status of stone order number 1053, one of the orders for the Olympus on

---

[12]     Though Andres submitted a change order for "Blizzard Quartz," *see* Ex. 6, "Blizzard" quartz is Allied's equivalent of "Jazz White." *See* Ex. 7 (Apr. 24, 2020 Email from J. Lim to M. Hemphill) ("The material should be what we have supplied for previous project (1053), 'Blizzard Quartz' which is ASI's equivalent of MQ Jazz White. . . ."). Thus, Allied's documents related to the Olympus on Broadway project generally discuss "Jazz White" quartz.

15

Broadway project, which included quartz. Ms. Hemphill told Defendant Lim: "Olympus on Broadway or order #1053 is asking if I can get any type of estimate on when the granite and quartz might be here. . . . *I still get no reports from any of the factories so I have no visibility at all.*" Ex. 9 (Feb. 13, 2020 Email between M. Hemphill and J. Lim) (emphasis added).

55.     Defendant Lim responded, "[d]ue to the Coronavirus in Asia, factories have delayed openings and staff shortages. There most likely will be a delay even with our contracted lead time of 12-14 weeks for granite and 14-16 weeks for quartz . . . . I do not know whether any materials have been bought yet by factories at this point of time since they were closed for Chinese New Year and have not reopened since." *Id.*

56.     Ms. Hemphill continued to have only indirect insight into quartz shipping status, filtered to her through Defendant Lim or Allied's Shipping Manager, Cherie Dai.

57.     In April 2020, Ms. Hemphill again confronted Defendant Lim with a separate, but related issue—Allied provided very little detail on quartz stone crate labels, especially compared to its crate labels for granite products, which caused confusion for Andres and complicated Ms. Hemphill's job duties.

58.     For example, below is a photograph of Allied's crate label for a crate containing granite, taken at a warehouse located at 1240 Centre Park Boulevard, #100, in DeSoto, Texas:



59.     The details on the granite crate label, as shown above, include the stone type, the description of where the stone would be used, the color name, product sizes for the slabs included in the crate, the total number of slabs, the crate number, and a clear indication that the granite was "MADE IN CHINA."

60.     In comparison, below is a photograph of Allied's crate label for an Olympus project quartz stone crate, taken in the same warehouse:



61.     Unlike the granite crate labels, Allied's quartz stone crate labels only included information regarding the sizes and number of slabs within the crate, and the crate number.

17

Allied's quartz crate labels did not include the stone type, the description of where the stone would be used, the color name, or an indication of from where the quartz came.

62.    On April 15, 2020, Ms. Hemphill emailed Defendant Lim, asking if it would "be possible to standardize the crat[e] labels from all factories," as "[t]he field/installers [were] having a hard time knowing what crate[] goes where." Ex. 10 (Apr. 15, 2020 Email from M. Hemphill to J. Lim). Ms. Hemphill detailed the issues she faced because of the existing labels, namely involving missing slabs and installers pulling stone crates at random. *Id.*

63.    Clearly agitated, Defendant Lim responded to Ms. Hemphill, copying Allied's Executive Vice President, Matthew Moore ("Moore"), and argued that the crate labels "ALREADY DO[] indicate for each crate the specific Unit Type as well as individual pieces within each of these unit types." Defendant Lim added that the crate labels also listed the crate number, and that "[i]t shouldn't[] matter which building each unit tops are used for and can be used based on what the install priority is. . . . It sounds to me like our field operations are not [doing] a good job of organizing which crates should be opened. . . ." *Id.*

64.    Later, Defendant Lim added that packing lists for various crates included "ALL the details," and "[t]he external label of the crate is just a summary of all pieces contained for customs purposes. . . . [I]t is unnecessary to have all the details that are in the packing list on the crate label." *Id.*

65.    Ms. Hemphill replied to Defendant Lim, in the case of another Allied multifamily project from the same timeframe, she was never provided with a packing list, and installers did not have access to them. *Id.*

66.    After Defendant Lim, in response, requested a call from Moore, and later told Ms. Hemphill that her emails were "disrespectful," Ms. Hemphill feared that she would be fired.

18

67. In light of this interaction with Defendant Lim, Ms. Hemphill considered that Allied's different treatment of quartz crate labeling—compared to its much more detailed granite crate labels—indicated that Allied was hiding the fact that it was importing quartz.

68. This suspicion was confirmed by additional information she obtained. For example, Ms. Hemphill also began receiving shipping updates in April 2020 for the Olympus on Broadway project stone through Allied's Shipping Manager, Ms. Dai. *See* Ex. 11 (Apr. 7, 2020 Email from C. Dai to M. Hemphill). On May 4, 2020, Ms. Dai provided the following updates for three containers containing Olympus on Broadway stone crates—TCNU8824075, ZCSU2696618, and ZIMU3026332:

| Vendor | Invoice | ETA To Port | Container # | SF | TM EXPRESS HOUSTON | DESOTO | Vendor's Color | Trucking Company/Freight Forwarder |
|--------|---------|-------------|-------------|-----|--------------------|--------|----------------|------------------------------------|
| ASPL | 20-04-103A | 3-May-20 | TCLU1449170 | 2922 10 crates | White Rock 2cm Vanity Tops (TM Express Houston for Project #1044 Sage @ Vintage Park) | | White Rock 2cm Granite Vanity Tops | LVEB Logistics Ella 832-701-9996 |
| ASPL (40' Container) | 20-04-103B | 3-May-20 | TCNU8824075 | 3478 14 crates | | White Rock 2cm & 3cm Vanity Tops (DeSoto for Project #1053 for Olympus on Broadway) | White Rock 2cm & 3cm Granite Vanity Tops | LVEB Logistics Ella 832-701-9996 |
| ASPL (40' Container) | HD-20003(2) | 3-May-20 | ZCSU2696618 | 14 PKGS 3989 | | MQ Jazz White 2cm/3cm Vanity Tops (Project #1053 Olympus on Broadway) | AX71 2CM/3CM CTS | Raj's |
| ASPL (40' Container) | HD-20003(3) | 3-May-20 | ZIMU3026332 | 11 PKGS 2401 | | MQ Jazz White 2cm/3cm Vanity Tops (Project #1053 Olympus on Broadway) | AX71 2CM/3CM CTS | Raj's |

69. Ms. Dai additionally attached packing lists for two of these containers, ZSCU2696618 and ZIMU3026332. *See id.*; *see also* Ex. 12 (Packing List for Container No. ZSCU2696618); Ex. 13 (Packing List for Container No. ZIMU3026332).

70. This information further indicated that Allied was concealing its quartz stone imports on the Olympus on Broadway project.

71. First, Allied's "Stone Inventory" spreadsheet, *see* Ex. 14 (Stone Inventory Spreadsheet), confirms the information in Ms. Dai's shipping updates—the stone products in containers ZSCU2696618 (mistyped as "ZCSU269618") and ZIMU3026332 were quartz

19

products. Indeed, containers ZSCU2696618 and ZIMU3026332 contained *only* quartz products:[13]

| Warehous | Project # | Project | Container # | Crate | Stone Color | Building | Floor | Date I | Sent | Total in Invento ry | Days in Invento ry |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 15 | Jazz White Quartz | 3B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 16 | Jazz White Quartz | 3B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 18 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 22 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 23 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 25 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 26 | Jazz White Quartz | 2A | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 27 | Jazz White Quartz | 2A | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 29 | Jazz White Quartz | 2B | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 30 | Jazz White Quartz | 2B | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 32 | Jazz White Quartz | 2B | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 34 | Jazz White Quartz | 2A | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 35 | Jazz White Quartz | 2A | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 39 | Jazz White Quartz | 2A/2B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 17 | Jazz White Quartz | 3B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 19 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 20 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 21 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 24 | Jazz White Quartz | 3A | 4.2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 28 | Jazz White Quartz | 2B | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 31 | Jazz White Quartz | 2B | 4 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 33 | Jazz White Quartz | 2B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 36 | Jazz White Quartz | 2A/2B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 37 | Jazz White Quartz | 2A/2B | 2 | 05/06/20 | | 1 | 22 |
| DeSoto | | 1053 Olympus on Broadway | ZIMU3026332 | 38 | Jazz White Quartz | 2A/2B | 2 | 05/06/20 | | 1 | 22 |

This was confirmed by Ms. Dai in her final email to Ms. Hemphill regarding the incoming containers—"Please note the remaining 2 *quartz* CTS containers ZCSU2696618 and ZIMU3026332 are released." Ex. 11.

72.     Further, Ms. Hemphill was able to match physical crates with details from the packing list for Container Number ZSCU2696618. For example, the packing list provided the following details for Crate Number 26:

---

[13]     Note that for the purpose of capturing this image, Allied's original spreadsheet has a filter applied to the "Container #" column. All spreadsheet screen capture column filters have been applied by Ms. Hemphill, unless otherwise noted. These filters are the only way with which Allied's spreadsheets have been interacted.

## PACKING LIST

NO:HD-20003(2)

DATE:MAR 23TH.2020

Project No: #1053    Color: AX71

| Wooden case number | Drawing no | Units Type | Unit No | SIZE (IN) | | T | Length mm | Width mm | PCS | SQ.M | G.W (TONS) | Wooden case size(mm) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NO.J | 1 | A1 Scheme 2-Reverse | 2 | 85 | 25 | | 2156 | 636 | 2 | 2.74 | 0.202 | 2820*450*10 |
| NO.26 | 9 | A1 Scheme 2-As Shown | 1 | 75 7/8 | 25 1/2 | 3 | 1927 | 648 | 3 | 3.74 | 0.215 | |
| NO.26 | 9 | A1 Scheme 2-As Shown | 3 | 85 | 25 | 3 | 2159 | 635 | 3 | 4.11 | 0.302 | |
| NO.26 | 25 | A4 Scheme 2-As Shown | 3 | 76 1/4 | 40 1/4 | 3 | 1937 | 1022 | 2 | 3.96 | 0.291 | |
| NO.26 | 25 | A4 Scheme 2-As Shown | 2 | 82 1/4 | 25 1/2 | 3 | 2089 | 648 | 2 | 2.71 | 0.199 | |
| NO.26 | 31 | B1 Scheme 2-As Shown | 1A | 91 7/8 | 25 1/2 | 3 | 2334 | 648 | 1 | 1.51 | 0.091 | |
| NO.26 | 32 | B1 Scheme 2-As Shown | 4 | 98 1/4 | 22 1/2 | 2 | 2496 | 572 | 1 | 1.43 | 0.057 | |
| NO.26 | 32 | B1 Scheme 2-As Shown | 5A | 21 3/4 | 4 | 2 | 552 | 102 | 1 | 0.06 | 0.003 | 2520*500*1040 |
| NO.26 | 32 | B1 Scheme 2-As Shown | 5B | 98 1/4 | 4 | 2 | 2496 | 102 | 1 | 0.25 | 0.012 | |
| NO.26 | 32 | B1 Scheme 2-As Shown | 5C | 21 3/4 | 4 | 2 | 552 | 102 | 1 | 0.06 | 0.003 | |
| NO.26 | 33 | B1 Scheme 2-Reverse | 2B | 91 7/8 | 25 1/2 | 3 | 2334 | 648 | 2 | 3.02 | 0.222 | |
| NO.26 | 34 | B1 Scheme 2-Reverse | 4 | 98 1/4 | 22 1/2 | 2 | 2496 | 572 | 2 | 2.85 | 0.113 | |
| NO.26 | 34 | B1 Scheme 2-Reverse | 5A | 21 3/4 | 4 | 2 | 552 | 102 | 2 | 0.11 | 0.006 | |
| NO.26 | 34 | B1 Scheme 2-Reverse | 5B | 98 1/4 | 4 | 2 | 2496 | 102 | 2 | 0.51 | 0.025 | |
| NO.26 | 34 | B1 Scheme 2-Reverse | 5C | 21 3/4 | 4 | 2 | 552 | 102 | 2 | 0.11 | 0.006 | |
| NO.26 | TOTAL: | | | | | | | | 25 | 24.43 | 1.543 | |

Ex. 12.  As shown above, Crate Number 26 in Container Number ZSCU2696618 contained 25

pieces of stone. *Id.*

73.    Again, Allied's "Stone Inventory" spreadsheet revealed that the 25 pieces of stone

in Crate Number 26 were "Jazz White" quartz:

| Warehouse | Project # | Project | Container # | Crate | Stone Color | Building | Floor | Date I | Sent | Total in Inventory | Days in Inventory |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DeSoto | | 1053 Olympus on Broadway | ZCSU269618 | 26 | Jazz White Quartz | 2A | 4 | 05/06/20 | | 1 | 22 |

Ex. 14.

74.    In the DeSoto warehouse located at 1240 Centre Park Boulevard, #100, Ms.

Hemphill found a crate labeled "Crate No 26#," containing 25 pieces, which only included the

following information on its label:

21



75.     This vague crate label was substantially less detailed than the following label for Crate Number 38 from a separate container shipment, which, according to Allied's "Stone Inventory" spreadsheet, *id.*, contained granite for the same Olympus on Broadway project:

| label | Granite | | | | | | |
|---|---|---|---|---|---|---|---|
| Description | Counter Top | | | | | | |
| Material | Surf White | | | | | | |
| Product Size | 81 5/8" | x | 42" | x | 1 1/8" | 4 | Pcs |
| | 82 1/4" | x | 42" | x | 1 1/8" | 4 | Pcs |
| | 83 1/8" | x | 42" | x | 1 1/8" | 4 | Pcs |
| | 107 1/4" | x | 42" | x | 1 1/8" | 4 | Pcs |
| Quantity | 16 Pcs | | | | | | |
| Crate No | 38# | | | | | | |
| | MADE IN CHINA | | | | | | |

76.     Further, the slabs inside Crate Number 26 were unlabeled and covered with several layers of paper and plastic. Ms. Hemphill had to remove the layers of paper and plastic and compare the sparse information on the crate label with the information on Allied's packing list for container number ZCSU2696618, Ex. 12, to discover that these slabs were, in fact, "Blizzard" quartz. The quartz products were packaged differently than other stone products to conceal the

true contents of the crate.

77.    The images below show the quartz slabs as they appeared upon unpacking (left), and the slabs with the labels Ms. Hemphill had to create to determine what the stone was and to what project it belonged:

 

78.    Ms. Hemphill later learned why Allied was concealing quartz imports after independently obtaining tracking information for Container Numbers ZSCU2696618 and ZIMU3026332 via ZIM Integrated Shipping Services's website.

79.    On May 18, 2020, shortly after these containers were released, Ms. Hemphill obtained the routing details for these containers. *See* Ex. 15 ("Track a Shipment" Information for Container No. ZSCU2696618); Ex. 16 ("Track a Shipment" Information for Container No. ZIMU3026332).

80.    The routing details for ZSCU2696618 showed that the container was loaded and exported from "Xiamen (FJ), CHINA. PEOPLE'S REPUBLIC." Ex. 15.

81.    Moreover, the routing details for Container Number ZSCU2696618 showed that the "[c]ontainer was discharged at Port of Destination" in Houston, Texas on May 4, 2020. *Id.* This information matched up with the date of Ms. Dai's May 4, 2020 email confirming that the

23

container had been released, as well as Ms. Dai's April 17, 2020 email indicating that the container's arrival port was Houston. *See* Ex. 11.

82.     The routing details for Container Number ZIMU3026332 revealed the same—the empty container was loaded and exported from "Xiamen (FJ), CHINA. PEOPLE'S REPUBLIC" and was discharged in Houston on May 4.  Ex. 16.

83.     At that point, the nature of Allied's scheme became clear: it was concealing its quartz imports because they originated in China and were thus subject to debilitating tariffs.  That is, Allied necessarily concealed the nature of Chinese quartz imports on Customs entry documents—and Defendant Lim became angry and agitated when asked about them—because Allied was fraudulently evading antidumping, countervailing, or Section 301 duties associated with such imports.  Indeed, had Allied paid the tariffs, it would not have been economically feasible to use the Chinese quartz on the Olympus—or any other—project.

84.     Moreover, Allied is continuing to use quartz on various projects throughout the region and thus continuing to employ this mislabeling scheme.

## B.     Allied Transshipping Scheme to Avoid Paying Antidumping, Countervailing, and Section 301 Duties

85.     In addition to misrepresenting quartz surface products as other products not subject to duties, Allied transshipped quartz products through other countries—namely Singapore—and misrepresented their true country of origin on Customs documents.  Ms. Hemphill observed Allied making such misrepresentations in connection with another multifamily housing project, The Crossing.

86.     The Crossing is a forthcoming, 29-story, 330-unit apartment building in Dallas,

24

Texas.[14]  Construction is slated to complete sometime in 2021.

87.    On June 14, 2019, Allied submitted a bid proposal to the Walsh Group, the builders for the Crossing.  *See* Ex. 17 (The Crossing Bid).  The bid included price quotes for "Arabescato" in kitchen, bath, wine bar, and mud bench areas.  *Id.*  Although "Arabescato" can be a type of marble, quartz, or granite, Allied's internal spreadsheets used "Arabescato" to refer to quartz products.  *See* Ex. 14.

88.    At the bottom of the bid for The Crossing, Allied indicated only that units were fabricated overseas and did not include any tariff information.  Ex. 17.  This information was purposefully more vague than other Allied bids for multifamily projects using granite and other products not subject to the same duties as Chinese quartz products.  *See, e.g.*, Ex. 18 (Parc at Ingleside Bid).

89.    Allied ultimately subcontracted with Walsh Group, and assigned The Crossing as Project Number 1034.  *See* Ex. 14.

90.    On May 14, 2020, Ms. Dai copied Ms. Hemphill on an email to announce that Container Number CSLU5159934 for "Multifamily Project #1034" was ready to be delivered to the DeSoto warehouse.  *See* Ex. 19 (May 14, 2020 Email from C. Dai to M. Hemphill).  Ms. Dai included that in the container were colors "MX14" and "AX71" quartz slabs, *id.*—"Arabescato" and "Blizzard" Quartz, respectively.

91.    This date was consistent with a May 9, 2020 Richen Stone, Inc. Delivery Order Ms. Hemphill ultimately obtained.  *See* Ex. 20 (May 9, 2020 Richen Stone Delivery Order).

92.    The Richen Stone, Inc. Delivery Order provided that materials in Container

---

[14]    *See* Walsh Group, *Multifamily Residential – The Crossing* (last visited Oct. 25, 2021), http://www.walshgroup.com/ourexperience/building/multifamilyresidential/thecrossing.html.

Number "CSLU5159934" would be delivered to the address for the DeSoto warehouse, that the container included 16 packages of "MX14/AX71," that the materials were for "Project No: #1034," and that the expected delivery date was May 14, 2020. *Id.*

93.     Critically, the Delivery Order was "To" Allied Supply, at its Singapore address. *Id.* Allied Supply's website, http://www.tobuystone.com/com/alliedstones/, provides that "Allied Supply specializes in unrelenting high quality natural stone products *from China*." (emphasis added).

94.     As explained above, Allied Supply is a business owned by Defendant Lim's relative—Ms. Hemphill understands the owner is Defendant Lim's father. There are no U.S. antidumping, countervailing, or Section 301 duties that apply to quartz surface products from Singapore.

95.     Moreover, Richen Stone, Inc., a California corporation, was not formed until November 5, 2018—*just fifteen days before* Commerce published its preliminary determination that certain quartz surface products from China were being, or were likely to be, sold in the U.S. at LTFV, and *after* Commerce preliminarily determined that countervailable subsidies were being provided to producers and exporters of certain quartz surface products by the Chinese government. *See* "Richen Stone, Inc.," California Secretary of State Business Search (last visited Oct. 25, 2021), https://businesssearch.sos.ca.gov/CBS/Detail.

96.     It is therefore clear that, in addition to concealing quartz products in paper and plastic packing materials to pass them as granite, Allied Supply transshipped Chinese quartz products through Singapore to Allied through a newly-created dummy importer (Richen Stone) in the United States to avoid the Chinese tariffs.

97.     Moreover, when Ms. Hemphill was at the DeSoto warehouse facility, located at

1240 Centre Park Boulevard, #100, in DeSoto, Texas, she observed similar crate labels and stone packing for The Crossing quartz products as she noticed for the Olympus on Broadway quartz products.

98.      Allied's "Stone Inventory" spreadsheet, Ex. 14, provides that The Crossing project stone imports include crate numbers "38" and "43," containing "Arabescato Quartz":

| Warehous | Project # | Project | Container # | Crate | Stone Color | Building | Floor | Date I | Sent | Total in Invento ry | Days in Invento ry |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DeSoto | | 1034 The Crossing | | 38 | Arabescato Quartz | 1 | 15 | | | 0 | |
| DeSoto | | 1034 The Crossing | | 43 | Arabescato Quartz | 1 | 16 | | | 0 | |

99.      Crates of quartz surface products for The Crossing project, like those for the Olympus on Broadway project, included packing slips that only indicated the crate number, number of stone slabs, and slab dimensions. Below is the crate label for crate 38, associated with The Crossing project:



100.      Again, like with the quartz crates for the Olympus on Broadway project, Ms. Hemphill had to match the crate labels up with project packing lists to generate labels that indicated the project name and number, as well as what materials were inside the particular crate. Below is the label Ms. Hemphill created for The Crossing crate 38, which contained "Arabescato Quartz":

27



101.    Further, Ms. Hemphill discovered another crate with a hand-written "No. 43" on the crate's wrapping, with a piece of paper in the bottom of the crate:



102.    Upon further inspection, Ms. Hemphill discovered that one side of the paper bore the same "43" crate number in the same handwriting as on the outer wrapping of the crate, and on the other side of the paper was a drawing for a "Vanity Extra Small QUARTZ TOP," accompanied by Chinese characters:

28

 

103.   Further, crates containing quartz bore the following heat treatment mark:



These heat treatment marks are applied according to the International Standards for Phytosanitary Guidelines for Regulating Wood Packaging Material in International Trade ("ISPM-15") adopted by the International Plant Protection Convention ("IPPC"). *See* U.S. Dep't of Agriculture, Animal & Plant Health Inspection Serv., *Wood Packaging Materials Frequently Asked Questions* (last updated June 2, 2020), https://www.aphis.usda.gov/wcm/connect/aphis_ content_library/sa_our_focus/sa_plant_health/sa_export/sa_wood_packaging/ct_wpm_faqs.

104.   IPPC heat treatment marks include the IPPC certification symbol, a two-letter country code (an "ISO 3166-1 alpha-2 code") developed by the International Organization for Standardization ("ISO"), and certification numbers from the regulating agency and treatment provider of the wood packaging. *See* Int'l Standards for Phytosanitary Measures No. 15, *FAQ*,

29

https://ispm15.com/faq/ (last visited Oct. 25, 2021).

105.    According to the ISO, "CN," as showed in the heat treatment mark Ms. Hemphill observed above, stands for the People's Republic of China. *See* Int'l Org. for Standardization, *ISO 3166—Country Codes Collection*, "CN," https://www.iso.org/obp/ui/#iso:code:3166:CN (last visited Oct. 25, 2021).

106.    Ms. Hemphill's suspicion that Allied was engaged in activity designed to mislead and defraud the Government has only grown over time. Allied's conduct dates back to at least Fall 2018, when the Government imposed duties on quartz surface products from China.

107.    In fact, data reveals that before Fall 2018, Allied imported from China dozens of containers of quartz surface product each month. After the Government imposed import duties on quartz surface products from China, however, Allied seemingly ceased all import activity. But then, as detailed herein, Allied again began importing containers of quartz from China sometime in 2020, including the containers that Ms. Hemphill observed. Neither of those container numbers appears in Allied's data.

### C.    Ms. Hemphill's Other Observations of Allied's Misconduct

108.    As stated, Ms. Hemphill joined Allied in 2019, shortly after the United States imposed duties on imports of quartz surface products from China in Fall 2018.

109.    Upon joining Allied, Ms. Hemphill was originally told that she would maintain complete control over her teams. Ms. Hemphill quickly learned, however, that she was not free to make leadership decisions, and the procedures Ms. Hemphill had used in her past roles were strictly controlled by Defendant Lim.

110.    At Allied, the company initially created stone drawings—or diagrams outlining dimensions for products like bathroom countertops—entirely in-house. Ms. Hemphill worked

30

from these drawings, and after noticing Allied's drawings had several measurement errors, she convinced Allied to have its stone factory produce the drawings instead. If the factory created the drawings for the stone it would ultimately produce and fabricate, this would promote efficiency and eliminate errors.

111.    Though Defendant Lim initially refused Ms. Hemphill's requests, he later contracted with a Singaporean company (likely Allied Supply) to create the drawings. In light of the foregoing concealment of quartz shipments and transshipping, the stone factory was in China, and Defendant Lim contracted with the Singaporean company as a "middle man" to hide the factory's location from Ms. Hemphill.

112.    Further, Allied did most of its stone ordering in secret. As part of her duties, Ms. Hemphill would compile stone drawings, accessory products (such as sinks), and information regarding stone colors and estimated installation dates to send to Defendant Lim, copying Allied Executive Vice President Moore. Ms. Hemphill typically would not hear back from Defendant Lim or Moore—even regarding container numbers, packing lists, or estimated arrival dates—until the day after a product container arrived and Allied needed to arrange for delivery.

113.    At her former employer, Republic Elite, Ms. Hemphill worked directly with stone factories—as was the industry norm in a processing role. The factories provided Ms. Hemphill with drawings and maintained constant communication with her until the stone arrived at Republic Elite's 3PL site. Ms. Hemphill was given container numbers and a packing list before products were shipped and was updated with products' estimated times of arrival.

114.    Though she expected to have a similar experience in her new position, at Allied, Ms. Hemphill never interacted with stone factories. Ms. Hemphill would submit customer approval to Defendant Lim, and Defendant Lim would coordinate with the Singaporean company

31

to order the stone.

115.   Despite the roadblocks Allied placed in Ms. Hemphill's way, she continued to attempt to implement processes to make Allied more efficient. Ms. Hemphill was able to convince Allied to use a 3PL company rather than store stone crates on job sites, where stone slabs were easily broken. Only at this point was Ms. Hemphill able to gain access to stone shipment container numbers. The 3PL company, however, was frustrated by being unable to access necessary shipping information.

116.   Customers—including builders Ms. Hemphill met while working for Republic Elite who started contracting with Allied because Allied's products were priced considerably lower than competitors' prices—were also frustrated. When customers eagerly requested delivery dates, Ms. Hemphill could not provide any information. Defendant Lim was the only person at Allied with the information customers requested.

117.   On the rare occasions where Defendant Lim would provide order information to Ms. Hemphill, it was obvious to her that the issues at Allied were more than benign, organizational issues. Allied did not use customer or project names for stone orders, only four-digit numbers. *See, e.g.*, Ex. 21 (Feb. 27, 2020 Email from J. Lim to M. Hemphill) (responding to Ms. Hemphill's notification of a Coquina Quartz order for the "Millennium III" apartment complex, "[n]ote that one of the files still had the project name 'millennium III' as part of the file name. One of the reasons we use codes is to maintain project confidentiality from our producers overseas."). And when Defendant Lim sent supporting documents to Allied's drafting team, identifying information was redacted.

118.   Ms. Hemphill also learned that information she had been given before joining Allied was false. Before she officially joined Allied, Ms. Hemphill met with Moore, who stated

32

that Allied imported cut-to-size quartz surface products from the Philippines.

119.   Over time, however, Ms. Hemphill discovered that, contrary to what Moore had assured her, there were no quartz factories in the Philippines that exported cut-to-size quartz products into the United States as of June 2020. Rather, quartz factories in the Philippines were only exporting full quartz slabs.

120.   One of Ms. Hemphill's business contacts from Republic Elite believed he located a factory offering cut-to-size quartz products out of the Philippines, but upon further inspection, the acquaintance learned that the factory was transshipping products from China to the Philippines and relabeling them.

121.   Upon information and belief, the above allegations are just a few examples of Defendants' misconduct, which continues today.

## SPECIFIC COUNTS

### COUNT ONE

#### FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(G)

122.   Ms. Hemphill realleges and incorporates by reference the allegations of paragraphs 1–122.

123.   Defendants knowingly made, used, or caused to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

124.   Because of Defendants' actions, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to civil penalties for each violation and treble damages under the FCA.

### COUNT TWO

#### FALSE CLAIMS ACT – 31 U.S.C. § 3729(a)(1)(C)

125.   Ms. Hemphill realleges and incorporates by reference the allegations of paragraphs 1–122.

126.   Defendants conspired to knowingly make, use, or cause to be made or used, false records and statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(C).

127.   Because of Defendants' conduct, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to civil penalties for each violation and treble

34

damages under the FCA.

## COUNT THREE

### UNJUST ENRICHMENT

128.    Ms. Hemphill realleges and incorporates by reference the allegations of paragraphs 1–122.

129.    Defendants avoided paying duties owed to the United States by submitting false statements to the Government regarding the antidumping, countervailing, and Section 301 duties Allied owed on imports of quartz surface products from China and were thus unjustly enriched in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator Melinda Hemphill prays for judgment against the Defendant as follows:

1.    That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $11,665 and not more than $23,331 for each FCA violation;

2.    That Plaintiff-Relator be awarded the maximum amount allowed pursuant to Section 3730(d) of the FCA;

3.    That to the extent the Government pursues its claims through any alternative remedy in another proceeding, as provided by Section 3730(c)(5) of the FCA, that Plaintiff-Relator be awarded the maximum percentage of that recovery allowed pursuant to Section 3730(d);

4.     That Plaintiff-Relator be awarded all costs of this action, including attorneys' fees

and expenses; and

5.     That the United States and Plaintiff-Relator recover such other relief as the Court

deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby

demands a trial by jury.

Date: November 24, 2021

Respectfully submitted,

Joel B. Bailey (Tex. State Bar No. 24069330)
HEDRICK KRING, PLLC
1700 Pacific Avenue, Suite 4650
Dallas, TX 75201
Phone: (214) 880-9600
Facsimile: (214) 481-1844
joel@hedrickkring.com

Daniel B. Pickard (DC Bar No. 453622; *pro hac vice* pending)
Stephen J. Obermeier (DC Bar No. 979667; *pro hac vice* pending)
Ashley E. Bouchez (DC Bar No. 1658447; *pro hac vice* pending)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: (202) 719-7000
Facsimile: (202) 719-7049
dpickard@wiley.law
sobermeier@wiley.law
abouchez@wiley.law

*Counsel for Plaintiff-Relator Melinda Hemphill*